UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs- Case No.: 2:09-cr-29-FtM-99SPC

EDWIN M. GONZALEZ
ELISEO GONZALEZ

_____

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on the Defendant Eliseo Gonzalez' Motion to Suppress (Doc. #29) filed on August 9, 2009, and the Defendant Edwin M. Gonzalez' Motion to Suppress (Doc. #35) filed on August 21, 2009. The Government filed its response to Defendant Eliseo Gonazalez' Motion to Suppress (Doc. #34) on August 19, 2009, and adopts the same arguments to the Motion to Suppress filed by Edwin Gonzalez.

On August 25, 2009, this Court set a hearing on the Motions to Suppress. The Government was represented by Assistant United States Attorney Jesus Casas who called one witness, Detective Gary Gambino. The Defendant Eliseo Gonzalez was present and represented by CJA Counsel Gino Lombardi . The Defendant Edwin M. Gonzalez was present and represented by Assistant Federal Public Defender Martin Der Ovanesian. Neither Defendant called any witnesses nor introduced any items of evidence.

# TESTIMONY and EVIDENCE

## Detective Gary Gambino

Detective Gary Gambino (Det. Gambino) is a detective with the Collier County Sheriff's Department (CCSO). Det. Gambino has served with the CCSO for approximately six (6) years– three (3) years on patrol and three (3) years in the vice and narcotics division. (Tr. 6:3-13).

At approximately 7:00pm, on April 21, 2009, Det. Gambino was working traffic enforcement at the 100 mile marker of Interstate 75 (I-75). (Tr. 6:19-22). While at that location, he noticed a white Nissan travel past him at a distance of approximately thirty (30) feet. When the vehicle passed his position, he had a clear view of the window tinting. (Tr. 7:16-17).

Det. Gambino testified that he believed the window tinting on both the passenger side and the driver's side windows was illegal. (Tr. 8:2-12). The windows were dark and he could not see inside the vehicle when it passed by his position. (Tr. 8:6-7). Further, Det. Gambino testified that the windows were tinted so dark that he could not observe the race or gender of the passengers or individuals inside the vehicle. (Tr. 8:8-12). Det. Gambino testified that he had made hundreds of stops for tint related violations during his service with the CCSO. (Tr. 8:13-19). He noted that tint violations were the primary reason for his interstate stops because of the number of violations "out there." (Tr. 8:19). Out of the hundreds of stops made by Det. Gambino, he estimated that only about twenty (20) to thirty (30) of his tint violation stops proved to be mistaken. (Tr. 8:20-24).

Based upon his observations, Det. Gambino performed a traffic stop just east of mile marker 100, about 100 yards east of the I-75 toll plaza. (Tr. 9:6-7, 10-11). Det. Gambino was riding in his unmarked vehicle by himself on the day of the stop, but there were two (2) other officers who were close to his position near the I-75 toll plaza. (Tr. 9:13-15).

After making the stop, Det. Gambino made contact with the Defendant Edwin Gonzalez, the driver of the vehicle. (Tr. 9:18-19). He asked Edwin Gonzalez for his license and registration. (Tr. 9:18-19). Gonzalez produced a Texas Identification Card. (Tr. 10:8-9). Det. Gambino asked if he had an actual driver's license. (Tr. 10:10-12). The Defendant admitted that his driver's license was suspended. (Tr.10:12-13). However, Gonzalez provided the other information related to the vehicle. (Tr. 10:14-16).

Det. Gambino stated that because Gonzalez was driving while his license was suspended, he could have been arrested at that time. (Tr. 10:17-20). However, Det. Gambino continued to speak with Gonzalez because his demeanor inside the vehicle, based upon a simple traffic stop, warranted further investigation. (Tr. 10:21-25). He then called Det. Gifford and Det. Poling to the location. (Tr. 10:25, 11:1).

After he made the stop, Det. Gambino testified that he only saw the driver at first. (Tr. 11:2-5). He approached the car from the passenger side and saw the front seat passenger. (Tr. 11:6-8). Not until he looked in the back seat did he realize that there were more passengers in the vehicle that he did not observe at first due to the dark tinting on the windows. (Tr. 11:8-12). He testified that the individuals in the vehicle were all very nervous. (Tr. 11:13-18). He noted the driver was trembling, and his hands and legs were shaking. (Tr. 11:19-21). He asked all of the occupants for some identification. (Tr. 11:22-23). He also asked their purpose for traveling. (Tr. 11:24-25). The driver, Edwin Gonzalez, said he lived in Tampa and was on the way to Miami to look for laborer work for the passengers. (Tr. 11:25, 12:1-2). Det. Gambino noticed there were no bags in the car or indications the Defendants were going on a trip. (Tr. 12:3-10). According to Det. Gambino, in his experience, when people are traveling on the interstate, they often have suitcases and multiple

personal items with them that could sustain them for weeks of travel. (Tr. 12:11-14). Here, he only saw a couple of small backpacks that really could only fit a day's worth of clothes and some toiletry items. (Tr. 12:14-17).

After making contact with the driver and after Det. Poling and Det. Gifford arrived, Det. Gambino asked Edwin Gonzalez to step out of the vehicle. (Tr. 12:18-20). The other occupants of the vehicle also got out of the vehicle and stood with Det. Poling and Det. Gifford. (Tr. 12:21-23). The Defendant Edwin Gonzalez was technically in custody at that time because he could have been arrested for driving on a suspended license. (Tr. 13:1-3). However, based upon Gonzalez' demeanor, Det. Gambino suspected another crime was being committed. (Tr. 13: 3-5). The Defendant remained overly nervous for just driving on a suspended license. (Tr. 13:5-7).

At that time, Edwin Gonzalez was read his Miranda rights in English. Gonzalez did not have any trouble understanding his Miranda rights. (Tr. 13:7-9). Det. Gambino said he then projected a scenario involving human smuggling and asked Gonzalez if he was correct in his assumptions. (Tr. 13: 18-20). Gonzalez said yes. (Tr. 13:20). Det. Gambino's scenario involved Defendant Gonzalez illegally transporting the men in his vehicle to Miami. (Tr. 13:23-25, 14:1-3). Gonzalez then admitted that he had come from Houston, Texas where he made contact with an individual who brokers people to be transported from Houston to Miami for monetary compensation. (Tr. 14:5-10). It took approximately five (5) to ten (10) minutes from the time of the initial contact until Gonzalez was read his Miranda rights and was interviewed by Det. Gambino. (Tr. 14:11-15).

Based upon Edwin Gonzalez' statements that his uncle Eliseo Gonzalez was involved in the smuggling operation, Det. Gambino decided to Mirandize Eliseo Gonzalez. (Tr. 14:16-20). However, Eliseo Gonzalez only spoke Spanish, therefore, a Spanish speaking officer was called to

translate. (Tr. 14:21-22). Det. Gambino said he tried to communicate with Eliseo, but that communications were not good because of Eliseo's lack of ability to speak English. (Tr. 15:1-5). It took the Spanish speaking officer approximately ten (10) minutes to arrive. (Tr. 15:20-21).

Once the Spanish speaking officer arrived, he read Eliseo Gonzalez his <u>Miranda</u> rights. (Tr. 15:25, 16:1-5). He said he understood his rights and agreed to speak with the officers. (Tr. 16: 6-7). Eliseo Gonzalez said he knew the individuals in the vehicle had entered the United States illegally and that he was utilizing his car to transport them from Houston, Texas to Miami so they could reunite with their families. (Tr. 16:7-11).

After the comments made by Edwin and Eliseo Gonzalez , Det. Gambino contacted Special Agent Mullin (SA Mullin), to conduct the ICE proceeding. (Tr. 16: 12-14). Det. Gambino was not familiar with immigration crimes, so he wanted SA Mullin's guidance. (Tr. 16: 16-19). SA Mullin wanted the Defendants detained for further interview and asked that the vehicle be impounded. (Tr. 16:20-22).

The Defendants were searched by Det. Poling about forty-five minutes (45) into the stop. (Tr. 16:23-25, 17:1-4). A paper ledger was found on Edwin Gonalez. (Tr. 17:8-11). The index card contained peoples' names and dollar amounts. (Tr.17:11-12). Edwin Gonzalez said the names were people he had transported prior to the current incident and that they had been dropped off in another state. (Tr. 17:17-20).

Edwin Gonzalez was placed under arrest for driving with a suspended license and was issued a citation to appear on the charge. (Tr. 36:14-16, 36:25, 37:1-2). Edwin and Eliseo Gonzalez were taken into custody and transported to the Golden Gate substation. (Tr. 18:16-20, 41:9-13). The time

from the initial stop until the Defendants were transported to the Golden Gate substation was approximately one and one half (1½) hours. (Tr. 18: 21-25, 41:16-19).

On cross examination, Det. Gambino stated that while his job entails stopping vehicles for traffic violations as well as vice and narcotics violations, he does not specifically stop vehicles that have license plates from certain states such as Texas and Arizona. (Tr. 25:11-15). Nor does he specifically look for vehicles with Hispanic individuals riding in them. (Tr. 25:16-18).

Det. Gambino stated that he tested the passenger side windows, both front and back, with his tint meter. (Tr. 30:11-14, 69: 18-25, 70:1-11). The tint meter showed that the front passenger side window had a light transmittance of twenty-seven percent (27%). (Tr. 58:21-22). Det. Gambino stated that he did not test his tint meter prior to using it on the Defendant's windows. (Tr.31:20-24). The Defendant was not issued a citation or a warning for the tint violation.(Tr. 37:5-9).

## **DISCUSSION**

The Defendant Eliseo Gonzalez argues that the police officers did not have probable cause to conduct a traffic stop under any of Florida's Window Tinting Statutes. He argues that he was an innocent passenger who posed no specific threat to the officer nor was implicated in any criminal activity and, therefore, should not have been detained and questioned. The Defendant Edwin M. Gonzalez likewise argues the traffic stop was not based upon probable cause and that there was an unreasonable seizure of the Defendant and his vehicle as well as an illegal search. The Government counters that there was probable cause for the stop, the detention was reasonable, and the search and subsequent statements solicited from the Defendants were lawfully obtained.

### *I. Edwin Gonzalez*

### *(1) Whether Probable Cause Existed for the Traffic Stop*

Under the Fourth Amendment, a decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation occurred, and an officer's motive in making the traffic stop does not invalidate what is otherwise "objectively justifiable behavior under the Fourth Amendment," U.S. v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) (quoting Whren v. United States, 517 U.S. 806, 810-812, 116 S. Ct. 1769, 135 L. Ed.2d 89 (1996); *see* United States v. Roy, 869 F.2d 1427, 1431-33 (11th Cir. 1989) *cert. denied,* 493 U.S. 818, 110 S. Ct. 72, 107 L. Ed.2d 38 (1989) (holding the subjective belief of Coast Guard did not invalidate boarding, even where the officers themselves believed they did not have probable cause) *See* Fla. Stat. § 316.610(1)(an officer may at any time upon reasonable cause to believe that a vehicle is unsafe or that the equipment is not functioning properly, require the driver to stop in order to inspect the vehicle). The Fourth Amendment test for a traffic stop should be whether a reasonable officer would have stopped the car for the purpose of enforcing the traffic violation. Whren, 517 U.S. at 810-812. Thus, in order to determine whether or not a specific Fourth Amendment requirement such as probable cause or reasonable suspicion has been met, the court must determine if the officer's actions were reasonable. Ornelas v. U.S., 517 U.S. 690, 696, 116 S. Ct. 1657, 1661-1662 (1996).

Florida law allows an officer to stop a vehicle in instances where the officer believes the vehicle's window tinting is too dark. State v. Moore, 791 So. 2d 1246 (Fla. 1st DCA 2001). Under the law in Florida, a traffic stop for a tint violation is supported by probable cause where the officer believes the vehicle's window tinting is in violation of Florida's legal limits. Fla. Stat. § 316.2953.

Det. Gambino as an experienced Collier County Deputy, made hundreds of tint violations stops. (Tr. 8:13-19). When he viewed the Defendant's window tinting as the vehicle passed his position on I-75, he believed the tinting on the windows was too dark under Florida's tint statute.

While the Defendant argues that the tint meter was not tested prior to its use on that day, and further argues that he was never given a citation for the tint violation, the tint meter did show a light transmittance of only twenty-seven percent ( 27%). (Tr. 37: 5-7, 58:21-22). Det. Gambino's belief that the window tint was too dark was confirmed because the windows were registering as a violation of the Statute. As such, it must be concluded that a reasonable officer would have made the same stop on the Defendant's vehicle for the purpose of enforcing the traffic violation. Whren, 517 U.S. at 810-812. Therefore, it is respectfully recommended that Det. Gambino had probable cause to make the traffic stop for a tint violation on the Defendant's vehicle.

The Defendant argues the window tint violation was merely a pretext for the stop. Det. Gambino's tint meter registered twenty-seven percent (27%) which is a violation of Florida law. (Tr. 58:21-22). Whether or not Det. Gambino used the tint violation as a pretext to make the traffic stop does not effect the validity of the stop. The constitutional reasonableness of a stop does not depend on the actual motivations of the individual officer who makes the stop. Whren v. U.S., 517 806, 809, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). Thus, even if the stop was pretextual, it does not impact the probable cause for the stop which was the tint violation. The tint meter registered a violation even if it was not tested earlier that day, and it demonstrates that Det. Gambino had probable cause based upon his observation to believe the Defendant's tinting was too dark under the Florida statute. Thus, the traffic stop was valid and supported by a reasonable belief that the Defendant was in violation of the Florida statute.

Based upon Florida's Statutes and the relevant case law, Det. Gambino did not violate the Fourth Amendment test for conducting a traffic stop for a window tint violation. The Court respectfully recommends that the traffic stop in this instance was valid.

### *(2) Whether there was an Unreasonable Seizure of the Defendant*

A traffic stop is a seizure within the limits of the Fourth Amendment. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing Prouse, 440 U.S. at 653)). Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than to a custodial arrest. Purcell, 236 F.3d at 1277. Therefore, the Court's analysis of a traffic stop is similar to that found in Terry v Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Purcell, 236 F.3d at 1277. "Under Terry, an officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place." Id. (citing Terry, 392 U.S. at 20) (internal quotations omitted)). Furthermore, the duration of the traffic stop is limited to the time necessary to effectuate the purpose of the stop. U.S. v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). The traffic stop may not last any longer than the time necessary to process the traffic violation unless there is "articulable suspicion of other illegal activity." Holloman, 113 F.3d at 196.

The Defendant Edwin Gonzalez argues there was no reason to detain him for an hour and a half (1½) for a mere traffic citation. However, contrary to his argument, the circumstances surrounding the Defendant's actions raised a reasonable suspicion that would allow Det. Gambino to inquire into areas that would exceed the circumstances that caused the initial traffic stop. The Defendant was driving on a suspended license. (Tr. 10:12-13). Det. Gambino discovered the suspended license within the first few minutes of the stop. Once the Defendant was found to be driving on a suspended license, Det. Gambino considered the Defendant to be under arrest. (Tr. 10:17-20, 13:1-3). The Defendant was read his Miranda rights immediately thereafter. (Tr. 13:7-9). The suspended license gave Det. Gambino sufficient cause to detain the Defendant for a period longer than it would normally take to issue a tint violation citation.

Although the Defendant argues that the stop was prolonged while Det. Gambino called for a K-9 unit to perform a search of the vehicle, no K-9 search of the vehicle was performed. (Tr. 27:22-25, 28:1-3). Moreover, Det. Gambino is a K-9 officer and had his K-9 with him at the scene of the stop. (Tr. 27:15-19). Thus, even if Det. Gambino had performed a K-9 search, there would have been no need to wait for a K-9 unit to arrive.

Additionally, the Defendant's overly nervous demeanor suggested to Det. Gambino that other criminal activity was involved. (Tr. 13:3-5). After the Defendant was read his Miranda rights, he admitted that he was transporting illegal aliens from Houston, Texas, to Miami, Florida, for a man he worked with in Houston. (Tr.14:5-10). It took approximately five (5) to ten (10) minutes from the time of the initial contact until Gonzalez was read his Miranda rights and was interviewed by Det. Gambino. (Tr. 14:11-15, 61:9-15). Clearly, the Defendant's behavior, demeanor, and Mirandized statements provided a sufficient "articulable suspicion of other illegal activity" to support the detention of the Defendant beyond the time it would take to issue the original citation. Thus, it is respectfully recommended that the Defendant was not illegally detained in violation of the Fourth Amendment.

### *(3) Whether the Search was Illegal*

The Defendant Edwin Gonzalez also argues that the search of the vehicle was illegal. Although in his memorandum of law, the Defendant states the officers searched the vehicle with a K-9 without probable cause, there was no K-9 search of the vehicle. (Tr. 28:1-5). Det. Gambino searched the vehicle after the Defendant was arrested and the vehicle was impounded. When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles contents. South Dakota v. Opperman, 428 U.S. 364, 369, 96 S. Ct.

3092, 49 L. Ed. 2d 1000 (1976). Inventory searches constitute one of the well-defined exceptions to the probable cause and warrant requirements of the Fourth Amendment. Id.; Illinois v. Lafayette, 462 U.S. 640, 103 S.Ct. 2605, 77 L. Ed. 2d 1000 (1983).

Sgt. Poling of the CCSO searched Edwin Gonzalez about forty-five (45) minutes into the stop. (Tr. 16:23-25, 17:1-4). Sgt. Poling found a paper ledger on Edwin Gonzalez that contained a list of names with dollar amounts beside each name. (Tr. 17:8-11). Det. Gambino testified that the search was made incident to Gonzalez' arrest. (Tr. 17:7-9). "Once an occupant of an automobile is placed under arrest, law enforcement may contemporaneously search both the occupant himself and the passenger compartment of the automobile." U.S. v.Quintana, 594 F. Supp. 2d 1291,1299 (M.D. Fla. 2009) (citing U.S. v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996)). Therefore, it is respectfully recommended that the search of the Defendant Edwin Gonzalez did not violate the Fourth Amendment pursuant to the search incident to arrest doctrine.

### *(4) Whether the Defendant's Statements Should be Suppressed*

At the end of his Motion, Defendant Edwin Gonzalez prays that all statements made by him should be suppressed although he makes no argument nor supplies any supporting case law for that proposition. Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 694 (1966). Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444. The initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored

by either the officer or the Defendant. Stansbury v. California, 511 U.S. 318, 323 (1994) (*per curiam*). A person detained pursuant to a routine traffic stop is not ordinarily considered in custody. Berkemer v. McCarty, 468 U.S. 420, 441, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

Det. Gambino testified that he read the Defendant Edwin Gonzalez his Miranda rights after it was discovered that his license was suspended. (Tr. 13:7-9). Edwin Gonzalez stated that he understood his rights and freely waived his right to remain silent. (Tr. 13:12-16). Edwin Gonzalez then informed Det. Gambino that he was indeed involved in the transport of illegal aliens to Miami. (Tr. 13:23-25, 14:1-3). There was no evidence presented to contradict Det. Gambino's testimony and the Court accepts it as true that he read Edwin Gonzalez his Miranda rights and that Gonzalez freely waived those rights and spoke with Det. Gambino.

Regarding the Defendant's statements made prior to the reading of his Miranda rights, the Defendant informed Det. Gambino that his driver's license was suspended. While the Supreme Court has said that the Fifth Amendment prohibits an officer from interrogating an arrestee without reading that arrestee his so-called Miranda rights, the rule extends only to the functional equivalent of an interrogation. U.S. v. McKenzie, 132 Fed. Appx. 788, 789-790 (11th Cir. 2005) (*citing* Innis, 446 U.S. 299). Voluntary statements-even those made without a Miranda reading-are admissible as long as they are given freely and voluntarily without compelling influences. Id. at 299-300; Miranda, 86 S. Ct. at 478.

Here, the Defendant was asked merely to provide a valid driver's license, and responded that his license was suspended. The Defendant was not under arrest at that time and was not being subjected to the functional equivalent of an interrogation, but was being asked a routine traffic stop question. The restraint to which Gonzalez was subjected at the time he answered Det. Gambino's

questions was "the minimal amount necessary for such a stop" and "did not involve the type of 'highly intrusive' coercive atmosphere that may require Miranda warnings even before a formal arrest is made." U.S. v. Crawford, 294 Fed. Appx. 466, 474 (11th Cir. 2008) (citing United States v. Acosta, 363 F.3d 1141, 1150 (11th Cir.2004)). Thus, there was no Miranda violation and no good cause to suppress any of the Defendant's statements.

## *II. Eliseo Gonzalez*

### *(1) Whether the Traffic Stop was Valid*

Eliseo Gonzalez argues the traffic stop of the vehicle in which he was a passenger was not reasonable. As noted above in the Court's analysis of the issue, the traffic stop was valid and was supported by a reasonable belief that the driver Edwin Gonzalez was in violation of the Florida tint Statute. Based upon Florida's Statutes and the relevant case law, Det. Gambino did not violate the Fourth Amendment test for conducting a traffic stop for a window tint violation, therefore, it is recommended the stop was indeed valid.

### *(2) Whether Eliseo Gonzalez was Legally Detained*

Defendant Eliseo Gonzalez states that he was unlawfully detained arguing that he was an innocent passenger who posed no threat to the officers nor was he implicated in any criminal activity. However, a reasonable suspicion of a crime being committed can justify the detention of an individual. U.S. v. Powell, 222 F. 3d 913, 917 (11th Cir. 2000)(citing Terry v Ohio, 88 S. Ct. 1868, 1883 (1968)).

In fact, the temporary, investigative detention of a person is constitutionally permissible if there exists, at the time of the detention, a reasonable suspicion that the person detained has been, is, or is about to be involved in criminal activity. U.S. v. Smith, 201 F.3d 1317, 1322-1323 (11th Cir.

2000) (citing U.S. v. Blackman, 66 F.3d 1572, 1576 (11th Cir.1995)). Although reasonable suspicion "requires more than a hunch, the requisite level of suspicion to make an investigative stop is 'considerably less than proof of wrongdoing by a preponderance of the evidence.' "Smith, 201 F.3d at 1322-1323 (citing U.S. v. Glover, 957 F.2d 1004, 1009 (2d Cir.1992) (quoting U.S. v. Villegas, 928 F.2d 512, 516 (2d Cir.1991)). In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention. Smith, 201 F.3d at 1322-1323 (citing U. S. v. Mikell, 102 F.3d 470, 475 (11th Cir.1996)). And, the totality of the circumstances are viewed in the light of the officers' special training and experience. Smith, 201 F.3d at 1322-1323 (citing U.S. v. Brignoni-Ponce, 422 U.S. 873, 884-86, 95 S. Ct. 2574, 2582, 45 L. Ed.2d 607 (1975)); *see also* U.S. v. Cortez, 449 U.S. 411, 417-19, 101 S. Ct. 690, 695, 66 L. Ed.2d 621 (1981).

Initially, Det. Gambino noted that Edwin Gonzalez was exceptionally nervous, more than one would equate with being caught while driving on a suspended license. Det. Gambino noticed that there was no luggage in the car that would indicate people were traveling on vacation or a business trip, and the passengers and the driver were acting suspicious, and were very nervous. (Tr. 11:13-18, 12:11-14). Det. Gambino described the occupants of the vehicle as having "a hand caught in the cookie jar kind of look." (Tr. 11:18-20). He further noted that all of the passengers were very tense and nervous, the driver was trembling and his hands and leg were shaking. (Tr. 11:19-20). The intense reaction by the driver led Det. Gambino to believe the traffic stop warranted further investigation. (Tr. 10:21-25).

Defendant Eliseo Gonzalez was the front passenger of the vehicle driven by Edwin Gonzalez when Det. Gambino made the traffic stop. Up until the point that Edwin Gonzalez told Det.

Gambino that his uncle, Eliseo Gonzalez, was also involved in the human smuggling operation, Eliseo Gonzalez was free to leave. (Tr. 60:4-6, 60:21-24). Det. Gambino stated the actual traffic stop portion of the incident only lasted about five (5) to ten (10) minutes. (Tr. 14:11-15, 61:9-15). After Edwin Gonzalez informed Det. Gambino that Eliseo Gonzalez was involved in a criminal enterprise outside the scope of the traffic stop, he was implicated in the smuggling operation, and was no longer free to leave. (Tr. 60:6-9, 61:4-6). At that point Det. Gambino had the requisite reasonable suspicion to detain Eliseo Gonzalez while officers investigated the allegations.

Further, after Det. Gambino read Eliseo Gonzalez his Miranda rights and began to interview him, it was clear that he did not have sufficient command of the English language to continue the interview. Det. Gambino sent for a Spanish speaking officer. The short delay in waiting for a Spanish speaking officer is not an unreasonable delay since it greatly benefited the Defendant to have a Spanish speaking officer present.

Based upon the totality of the circumstances, most importantly, the fact that Edwin Gonzalez implicated Eliseo Gonhzalez in the smuggling operation, Det. Gambino had a reasonable suspicion that Eliseo Gonzalez had committed or was in the act of committing a crime and could detain him for further investigation. Powell, 222 F. 3d at 917.

### (3) Whether Post Detention Statements Should be Suppressed

The Defendant Eliseo Gonzalez states that all statements made by him should be suppressed. Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S.

at 478-479.  Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444.  The initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored by either the officer or the Defendant. Stansbury, 511 U.S. at 323.  A person detained pursuant to a routine traffic stop is not ordinarily considered in custody. Berkemer, 468 U.S. at 441.

Eliseo Gonzalez was read his Miranda rights in English. (Tr. 14:18-20).  When Det. Gambino realized that Eliseo could not communicate in English, he sent for a Spanish speaking officer. (Tr. 14:21-22).  Once the Spanish speaking officer arrived, Eliseo was read his Miranda rights in Spanish. (Tr. 15:25, 16:1-5).  Eliseo argeed to waive his Miranda rights and spoke with Det. Gambino. (Tr. 16:6-7).  He admitted to being part of the smuggling operation. (Tr. 16:7-11).

It is clear that Eliseo Gonzalez understood his rights and voluntarily waived his right to remain silent. (Tr. 13:7-9).  Thus, it is respectfully recommended that the Motion to Suppress any statements made by Eliseo Gonzalez be denied.

## CONCLUSION

It is clear from the evidence and testimony presented at the hearing that Det. Gambino had probable cause to believe the Defendant's vehicle violated Florida's tint statute. Further, based upon the demeanor of Edwin and Eliseo Gonzalez and Defendant Edwin Gonzalez' post Miranda comments, there was a reasonable suspicion of further criminal activity occurring requiring further investigation.  Further, any and all statements made by the Defendants were made in accord with the Supreme Court's holding in Miranda v Arizona.  As such, neither Edwin nor Eliseo Gonzalez

had their constitutional nor Miranda rights violated by Det. Gambino. Consequently, the Court respectfully recommends that the respective Motions to Suppress should be denied.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

(1) The Defendant Edwin Gonzalez' Motion to Suppress (Doc. #29) should be **DENIED**.

(2) The Defendant Eliseo Gonzalez' Motion to Suppress (Doc. #34) should be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully Recommended** at Fort Myers, Florida, this __15th__ day of September, 2009.

/s/ Sheri Polster Chappell
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record